# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

B.S., a minor child by and
through his parents and natural
guardians, K.S. and M.S.,

Plaintiffs,

v.

Anoka-Hennepin Public Schools,
ISD No. 11, Tom Heidemann,
Minnesota Department of Education,
Brenda Cassellius, Office of
Administrative Hearings, and
Tammy Pust,

Defendants.

**MEMORANDUM OPINION
AND ORDER**
Civil No. 13-3220 ADM/JJK

---

Margaret O'Sullivan Kane, Esq., Kane Education Law, LLC, St. Paul, MN, on behalf of
Plaintiffs.

Martha J. Casserly, Esq., Minnesota Attorney General's Office, St. Paul, MN, on behalf of
Defendants Minnesota Department of Education, Brenda Cassellius, the Office of Administrative
Hearings, and Tammy Pust.

Charles E. Long, Esq., and Timothy R. Palmatier, Esq., Kennedy & Graven, Chartered,
Minneapolis, MN, on behalf of Defendants Anoka-Hennepin Public Schools, ISD No. 11, and
Tom Heidemann.

---

## I. INTRODUCTION

On February 26, 2014, the undersigned United States District Judge heard oral argument

on several motions. B.S. (the "Student"), a minor child, by and through his parents and natural

guardians, K.S. and M.S. (the "Parents") (collectively "Plaintiffs") appeal a special education due

process hearing decision pursuant to the Individuals with Disabilities Education Act, 20 U.S.C. §

1400 et seq. ("IDEA"). Named in the underlying action as Defendants are Independent School

District No. 11, Anoka-Hennepin Public Schools and Tom Heideman, Chair of the Anoka-Hennepin Board of Education (collectively the "School District"). In this action, Plaintiffs now sue as additional Defendants the Minnesota Department of Education, the Office of Administrative Hearings, Education Commissioner Brenda Cassellius, and Chief Administrative Law Judge Tammy L. Pust (collectively "State Defendants"). Plaintiffs assert the State Defendants violated their due process right to a fair hearing.

The State Defendants seek to be dismissed as parties to this appeal for failure to state a claim for relief on all counts alleged against them [Docket No. 15]. Defendant School District moves for Judgment on the Record [Docket No. 22]. Plaintiffs move for summary judgment [Docket No. 25]. For the reasons stated herein, State Defendants' motion is granted, the School District's motion is granted, and Plaintiffs' motion is denied.

## II. BACKGROUND

### A. The IDEA

The IDEA requires a school district accepting federal funds to provide disabled children within its jurisdiction a "free appropriate public education" ("FAPE"). 20 U.S.C. §§ 1400(d)(1)(A), 1412(a)(1)(A). Providing a FAPE is a "collaborative process . . . between parents and schools," with the individualized education program ("IEP") as the "central vehicle" for the collaboration. Ridley Sch. Dist. v. M.R., 680 F.3d 260, 269 (3d Cir. 2012). A school must formulate an IEP tailored to the disabled child's unique needs. 20 U.S.C. §§ 1412(a)(4), 1414(d)(1)(A).

Parents who are dissatisfied with the substance or implementation of their child's IEP may request a state administrative due process hearing before an independent hearing officer.

20 U.S.C. § 1415(f); Minn. Stat. § 125A.091 (2013).

In Minnesota, a party may appeal the hearing officer's decision to either federal district court or the state court of appeals. 20 U.S.C. § 1415(i)(2)(A); Minn. Stat. § 125A.091, subd. 24.

## B. Due Process Hearing Procedure

Plaintiffs requested an administrative hearing in May 2013. Compl. ¶ 1 [Docket No. 1]. During a prehearing conference held June 14, 2013, Plaintiffs' counsel indicated that she usually requests a day and a half to present her evidence. Administrative Record [Docket No. 12] ("AR"), June 14 Tr. 9; Compl. ¶ 20. Counsel for the School District indicated he needed about a day. Id. In the Prehearing Order, Administrative Law Judge ("ALJ") Eric L. Lipman granted each party "9 hours of hearing time to present the testimony of its witnesses and to conduct cross-examination of the opposing party's witnesses." AR, Second Prehearing Order, June 17, 2013 ¶ 10. Counsel were directed to "plan their hearing presentations accordingly." Id.

The administrative hearing was held on August 6, 7, and 8, 2013. Id. ¶ 9; see AR, Findings of Fact Conclusions of Law and Order, September 20, 2013. Prior to the start of the evidentiary hearing, the parties arrived at a settlement of claims for prospective relief; accordingly, the remaining issues related solely to the propriety of an award of compensatory education services. AR, Aug. 6-8, 2013 Hearing Transcript ("Hr'g Tr.") 50-53. On the first day of the hearing, the School District's counsel raised concerns about Plaintiffs' counsel's use of her trial time, stating,

> I am going to interject a larger concern or objection. At this point I think [Plaintiffs' witness] has been testifying for over four hours. It's almost half the allotted time of testimony that [Plaintiffs' counsel] has in this case.

Id. at 261. On the second day of the hearing, counsel for the School District again raised concern

over the use of the nine hours of testimony time. Id. at 357. Plaintiffs' counsel gave no indication at this time, or on the day before, that she was unable to finish presenting her evidence in the allotted time. Later, on the second day of the hearing, after returning from the lunch break at 1:21 p.m., ALJ Lipman reminded Plaintiffs that he was keeping time and Plaintiffs had used 6 hours and 50 minutes of their 9 hours allotted. Id. at 444. Plaintiffs' counsel expressed surprise about the time limit, not recalling the limit was set in the Prehearing Order. Id. at 445. Plaintiffs' counsel objected to the time limit as "an artificial restriction [that] certainly violates my clients' right to due process to the extent that they bear the burden and have the right to present evidence relevant to these proceedings." Id. at 445-46.

At the time of Plaintiffs' objection, ALJ Lipman referenced the Minnesota Department of Education's Best Practices in Hearing Management of Special Education Disputes. See Compl. Attachment B. He also paraphrased Minnesota Statute § 125A.091, subd. 18, stating: "The Hearing Officer must limit an impartial due process hearing to time sufficient for each party to present its case" and "must establish and maintain control and manage the hearing." Hr'g Tr. 446, 449. This, the ALJ explained, was the motivation for prehearing conference and the Prehearing Order. Id. at 450. Within the 9 hours of hearing time, Plaintiffs' counsel had latitude to present the salient evidence. Id.

On the third day of the hearing, Plaintiffs' counsel continued to object to the time limitation.[1] ALJ Lipman responded:

Well, here's the thing: I did some research into this last night and there is authority

---

[1] For the entire second day and part of the third day, Plaintiffs only examined Todd Springer, the Student's case manager. When asked by ALJ Lipman if Plaintiffs' counsel would like to reorder her evidence or examinations, Plaintiffs' counsel declined. Hr'g Tr. 448.

for the proposition that trial courts have discretion to place reasonable limits on the presentation of evidence, to prevent undue delay, waste of time, or needless presentation of cumulative evidence. I also put in the nine-hour restrictions because I don't think that the issues raised in the Due Process Complaint, particularly after the discussion at the prehearing conference, would require more than nine hours of testimony on either side. And, frankly, having gone through nearly three days of hearing, I'm still of that view, that adequate presentation of the student's claims and the District's defense could comfortably fit within 18 hours of hearing time.

Id. at 779. Plaintiffs' counsel responded to the ALJ that she would appeal the issue. Id. at 782-83. At the end of Plaintiffs' allotted time, ALJ Lipman stopped Plaintiffs' counsel. She was not allowed to call further witnesses and she was not permitted to cross-examine the School District's witnesses. Id. at 627-31.

The ALJ provided Plaintiffs with an opportunity to adjust their presentation of evidence, and to extend their time limit by 30 minutes for a formal offer of proof. Id. at 448, 717. ALJ Lipman indicated Plaintiffs were free to make their offer of proof in any manner they chose—including calling the Parents. Id. at 718-19, 797-802. Plaintiffs' counsel opted to make an informal offer of proof.

## C. Administrative Record

The due process hearing in this matter was held on August 6, 7 and 8, 2013. The administrative record consists of testimony and evidence admitted during the course of the hearing.

### 1. The Student's 2009 Evaluation

The Student is 17-years old and attends Anoka High School. Ex. 10.[2] In 2009, while the Student was in 6th grade, the School District conducted an initial special education evaluation.

---

[2] All references to Exhibits are to the exhibits listed in the Certified Inventory of the Administrative Record [Docket No. 13] (Filed Under Seal)

Ex. 2. The School District acknowledged that the Student had received an independent diagnosis of Attention Deficit Hyperactivity Disorder ("ADHD") from the Fraser Child & Family Center in August of 2006. Id. at AH-004-005, 014-015. The School District's initial evaluation concluded that the Student did not meet the criteria for a specific learning disability, but did meet the initial criteria for "Other Health Disability." The "Learner-Based Needs" identified in this evaluation included: (1) needs support in all academic areas to bring his functioning up to grade level; (2) needs to increase his rate of timely independent work completion; (3) needs to be held accountable for doing his own work in order to avoid being dependent on others; (4) needs to develop more sophisticated organizational strategies; and (5) needs to increase his attention to task. Id. at AH-021. The evaluation summary, which included references to the Fraser study, noted that "motivational factors" may be impacting the Student's performance at school, as the Student appeared to engage with non-school material that he found interesting. Id. at AH-017. In the summary, based on interviews with the Student, the Parents, the Student's teachers, and the Fraser report, the School District's psychologist:

> wonder[ed] if [the Student] is acquiring a coping strategy of learned helplessness. His teachers and his mother are working far harder than he is to accomplish his academic tasks. Teachers report his effort to be poor. He may be learning that if he appears lost, he can either get a reduced workload or get someone else to step him through it one-on-one. His teachers may need to gauge whether [the Student] doesn't do the work or if he can't do the work. If they suspect that it may be the former, he needs increased accountability for independent work completion.

Id.

### 2. 2010-2011 School Year

During his 8th grade year, the Student was served under an annual IEP with an effective date of February 21, 2011, and a "significant change" of June 1, 2011. Hr'g Tr. 362-63; 366-68;

6

Exs. 10, 61. The Student's 8th grade IEP included direct instruction; it also included goals and objectives addressing work completion, on-task behavior, reading skills, and written language skills. Ex. 61. The Student received daily organizational strategies. Ex. 10 at AH-087. His Organizational Strategies class provided assistance and instruction in test taking strategies, assignment completion, "chunking" of information and organization. Ex. 61 at AH-629, 634; Hr'g Tr. 645.

### 3. 2011-2012 School Year

In 2011, the Student entered high school. He continued to receive direct instruction and support to address his reading and written language goals through the Essential English class—a special education class. Hr'g Tr. 647. The Student's case manager, Todd Springer, met with the Student each school day to discuss his workload. The Student had attendance issues during the year, including tardiness, skipping classes, and leaving school after lunch and not returning. Ex. 18 at AH-107; Ex. 41. His education was also disrupted by an altercation that resulted in the Student's hospitalization. In the first trimester, the Student's report card reflected all failing grades with the exception of a "D" in Essential English, and for the second trimester, failing grades in two classes and "D's" in his remaining classes. Ex. 62.

In February 2012, the School District completed a three year reevaluation of the Student. Ex. 18. An IEP team meeting, which included the Parents, was held to discuss the results and to review and revise the IEP. Exs. 19, 20; Hr'g Tr. 665-68. The evaluation report concluded that the Student continued to qualify for special education services under the category of Other Health Disabilities ("OHD"). Ex. 18 at AH-115; Hr'g Tr. 727. The report identified several "Learner Based Needs": "needs to improve academic engagement by remaining awake and alert in class,

by coming to class with necessary material, by learning strategies for planning and managing workload, and by avoiding distractions"; "needs to improve his rate of work that is completed on time and to expectations"; "needs to work on developing skills to enable him to complete tasks that are of low personal priority"; "needs to continue to work on his ability to finish assignments"; and, "needs to continue to develop work skills including initiating tasks, maintaining a productive work rate and completing tasks in a timely manner as well as job seeking skills and positive interpersonal skills." Ex. 18 at AH-115. The report reflects the Parents agreement with the conclusions and did not express disagreement with any aspect of the evaluation. Hr'g Tr. 665-66; Ex. 18 at AH 118.

Following the completion of the reevaluation and an IEP meeting on March 26, 2012, the team developed a new IEP for the Student. Ex. 23. The team added several additional accommodations and modifications to the IEP, including: "shortened assignments" to focus on quality rather than quantity of work; the option of "pass/fail grading"; modified tests; retesting for test scores lower than 70% when the Student had completed all assignments; and reading of tests aloud and added time on tests. Id. at AH-141; Hr'g Tr. 674. In addition, the team proposed extended school year ("ESY") services to permit the Student to recover credits for classes he had previously failed during his 9th grade. Ex. 23 at AH 142; Hr'g Tr. 675. The Parents, after being provided notification of their parental rights, provided their written consent to the proposed IEP on March 28, 2012. Exs. 22, 58; Hr'g Tr. 669-72. At no time during the remainder of 9th grade did the Parents express disagreement with the IEP. Hr'g Tr. 672.

The Student finished his 9th grade year with his best trimester grades to that point. Ex. 62. With the exception of physical education, the Student's report card reflects grades of "C"

or better in all of his classes. Ex. 62. The Student never completed the ESY credit recovery services that were offered to him in the Summer of 2012 because he was caught purchasing marijuana from a peer at school on June 26, 2012, and he never returned to the ESY program thereafter. Ex. 41 at AH-264; Hr'g Tr. 675.

### 4. 2012-2013 School Year

An IEP meeting was held on September 28, 2012, at the beginning of the Student's 10th grade year. Exs. 27-28; Hr'g Tr. 676-79. The Student's IEP was revised. Ex. 30. The new IEP, with an effective date of October 26, 2012, delineated the direct support that the Student would receive in all of his general education classes. Ex. 30 at AH 170-71. Under the new 10th grade IEP, the Student also was supported through an Essential Study Skills class and through daily assistance and instruction from his case manager to address organization and work completion deficits. Ex. 42 at AH 305; Exs. 59, 62; Hr'g Tr. 684. The Student received assistance in organizing/recording assignments, managing time, note-taking, test-taking strategies and breaking assignments into manageable parts. Hr'g Tr. 514, 602-03, 640-41, 644-45, 648-49, 752-53. The Student also attended supported classes where he was provided additional classroom assistance from either a paraprofessional or other licensed special education instructor. Hr'g Tr. 648-49, 745-47, 750-51.

The Student's report card of his first trimester grades showed him failing two classes while passing the remainder of his classes. Ex. 62. His second trimester grades were: Physical Education (A-); Reading Foundations (B-); Geometry (C); and, Physical Science (C). Exs. 47, 62.

Upon the Parents' request, the School District held another IEP meeting on January 4,

2013, to address the Parents' concerns and requests. Ex. 100 at 48-51; Ex. 34. Following the

meeting, the District modified the IEP. Ex. 33. The Parents consented to the proposed changes

to the revised IEP. Hr'g Tr. 703-04. The Student's case manager, Springer, testified that the

faculty and paraprofessionals working in the Student's classes were informed of the changes to

the IEP and Springer checked to assure the revised IEP was being implemented. Id. 707-09. The

Student appeared to make progress on completing assignments and becoming current on his

school work. Id. at 713.

On May 8, 2013, the Student lit a cigarette in class and began to smoke, resulting in his

suspension for three days. Ex. 41; Hr'g Tr. 711-12. The Student served the suspension at home.

He returned to school having completed none of his assigned class work. Hr'g Tr. 714. The

Student finished the school year, receiving a report card with the following grades: Reading

Foundations (F); Geometry (C); U.S. History (D); Foods (D+); and, Investigating Careers (C).

The Parents requested a special education due process hearing pursuant to 20 U.S.C. §

1415 on May 22, 2013.

## D. Plaintiffs' Claims as to What Was Left Out of the Administrative Record

Plaintiffs claim ALJ Lipman's enforcement of the Prehearing Order's time limit resulted

in testimony and evidence being unfairly left out of the administrative record. Plaintiffs claim

that they should have been permitted to admit the Fraser report from 2006 that was referenced in

the Student's initial evaluation.[3] Plaintiffs claim this evidence demonstrates the Student should

have been categorized as a student with a Specific Learning Disability, not as a student with

---

[3] Plaintiffs acknowledge the Fraser evaluation was not admitted because Tricia Hughes, Plaintiffs' first witness, was unable to authenticate the exhibit as a complete copy. Hr'g Tr. 117-18. Plaintiffs did not attempt to submit it again.

"Other Health Disabilities." In addition, this evidence would show that recommendations from the Fraser report were not implemented as they should have been by the initial, and subsequent, IEPs. Without citation to supporting evidence, Plaintiffs also claim that the support services provided by the School District were not special education supports. Pls.' Mem. Opp'n to J. on Record [Docket No. 38] 14-15. Plaintiffs also claim Springer did not document the support that he was providing for the Student. Plaintiffs claim, had they been permitted, they would have testified that the supports and services testified to by Springer were not provided to the Student. Springer did not record his contact with the Student until after the IEP meeting in January 2013.[4] Plaintiffs assert they were not given adequate opportunity to prove that agreed upon services and modifications were not provided to the Student. In addition, Plaintiffs claim the Parents would have testified that IEPs are "take-it-or-leave-it" propositions, so that when they consented to the IEPs, they were not agreeing that the IEP was appropriate, but were merely trying to get as many services as possible to help their son.

Plaintiffs also contend an incident that the School District considered a "fight," and which was included in his February 2012 IEP evaluation, was actually a problem with a bully who had been harassing the Student. The Parents claim they repeatedly tried to remedy the situation, but AHPS declined to remove the "fight" from the Student's IEP and did not take action to correct the bullying situation.

Plaintiffs contend that most of the services AHPS offered to the Student were after school, during the summer, and were not special education supports and services.

---

[4] Plaintiffs' counsel cross examined Springer for more than a day of her allotted time. She established that Springer had not kept thorough records, which the ALJ acknowledged in his decision.

## E. Best Practices in Hearing Management of Special Education Disputes

The Minnesota Department of Education ("MDE") contracts with the Office of Administrative Hearings ("OAH") to provide fair and impartial hearings for parents and students challenging IEP decisions. Plaintiffs claim the MDE and the OAH cooperated to create a set of "best practices" for special education administrative hearings. Compl. ¶ 34. The cooperative relationship regarding the best practices began on September 21, 2011, between Barbara Case, Supervisor of the MDE's Special Education Division, and ALJ Lipman in response to several cases, including one particularly lengthy and expensive case. Id. Lipman suggested there were "ways in which we could better focus the litigants in special education disputes and cabin the length of due process hearings." Compl. Attachment B. In an email, ALJ Lipman suggested, "While the practice on the length of due process hearings varies considerably from state to state, to my mind [the various lengths of hearings] suggests that the states have some discretion to make needful rules in this area – and that this would not offend federal education officials by doing so." Id. ALJ Lipman proposed the following limitations: "Each party to a due process hearing would be permitted no more than 6 hours of hearing time for direct examination of that party's witnesses and cross-examination of an opposing's party's witnesses." Id. ALJ Lipman offered to draft for the MDE a revision to Minn. Stat. § 125A.091, subd. 18, which could be proposed to the Minnesota State Legislature. Id.

No agency bill was presented. Instead, the MDE and OAH drafted "suggested best practices" for Minnesota ALJs. Raymond R. Krause, the Chief ALJ for the OAH prior to Tammy Pust, emailed the Special Education Bar that, "These practices represent expectations that the [MDE] has for trial practice in order to align Minnesota practice more closely with State

and Federal statute and rule." Id.  Chief ALJ Krause continued, "The Administrative Law Judges (ALJ) of the OAH have been made aware of these expectations and will be implementing them going forward." Krause attached the suggested best practices, which read in relevant part, "In all but exceptional circumstances, evidentiary hearings should be concluded within three (3) hearing days of six (6) hours each." Id. (citing 34 C.F.R. § 300.15).

By setting these administrative hearing expectations, Plaintiffs argue MDE and OAH, and their respective leaders, Commissioner Cassellius and Chief ALJ Pust, have violated the IDEA (Count 1), Minn. Stat. § 125A.091 (Count 1), the Fourteenth Amendment of the United States Constitution and 42 U.S.C. § 1983 (Count 2 against MDE and OAH and Count 3 against Commissioner Cassellius and Chief ALJ Pust), the Minnesota State Constitution, Article I, § 7 (Count 4), and the Minnesota Administrative Procedures Act, Minn. Stat. §§ 14.001 to 14.69 (Count 6).  Plaintiffs argue that State Defendants' "suggested best practices" amounted to a directive to the ALJs to limit hearings.  This directive, Plaintiffs argue, violates Plaintiffs' rights to a due process hearing.

State Defendants argue they are not proper or necessary parties to this appeal of an administrative hearing decision.  State Defendants also argue that they did not require the ALJs impose a time limit.  Instead, they offered ALJs advice to consider in the efficient administration of the special education hearings, as required by state law.  State Defendants argue in the event the Court were to find the ALJs were directed to limit hearings to three days, the State Defendants then argue that ALJ Lipman did not follow the directive, but rather used appropriate discretion to manage the hearing.  Therefore, Plaintiffs lack standing to challenge the alleged State policy.  Finally, State Defendants argue there are no allegations which could amount to an

agency policy of denying impartial hearings by application of discretionary time limits.

## III. DISCUSSION

Plaintiffs request, through a motion captioned "summary judgment," that this Court declare "the application of arbitrary and restrictive time limits on the Plaintiffs' presentation of evidence and the denial of the opportunity to cross examine [AHPS] witnesses in the special education administrative hearing is a violation of their procedural protections under the [IDEA] . . ." Mem. Supp. Summ. J. [Docket No. 33] 1. Plaintiffs' Complaint and Memorandum fail to clearly state which claims are asserted against which Defendants and what relief is expected as a result. Two separate issues seem to be raised in Count 1. See Compl. ¶¶ 45-50. First, Plaintiffs appeal the ALJ's decision, including his procedural decision to enforce a time limit on Plaintiffs' presentation of evidence. Second, Plaintiffs make claims against the State Defendants, arguing that State Defendants imposed "best practices" as a rule that ALJ Lipman and ALJs in general were required to follow.[5] The Court will address Plaintiffs' appeal claims first.

### A. Judgment on the Record

There are at least two types of appeals of an ALJ's administrative decision. First, a plaintiff can object to decisions the ALJ made before and during the course of the hearing, such as courtroom management decisions. Second, a Plaintiff can object to ALJ's final decision and his conclusions of law.

---

[5] Given the lack of case law in this area, the confusion is somewhat understandable. But unclear pleading has again made the task more difficult. See I.E.C. v. Minneapolis Pub. Schs., No. 12-2997, 2013 U.S. Dist. LEXIS 121718, at *8-12, 28-31 (D. Minn. Jun. 24, 2013), adopted by, 970 F. Supp. 2d 917 (D. Minn. Aug. 26, 2013).

### 1. ALJ Discretion to Set Time Limits

Federal regulations provide parents with the rights to (1) have the child who is the subject of the hearing present; (2) open the hearing to the public; and (3) have the record of the hearing and the findings of fact and decisions provided at no cost to parents. 34 C.F.R. § 300.512(c). Beyond these requirements, the IDEA relies on the states to develop their own hearing procedures. State agencies must "establish and maintain procedures" in keeping with the outlines provided by 20 U.S.C. § 1415, "to ensure that children with disabilities and their parents are guaranteed procedural safeguards with respect to the provision of a free appropriate public education."

In Minnesota, statutes provide procedural safeguards to ensure a fair hearing before a qualified independent hearing officer. The Education Commissioner chooses an ALJ from "a list of qualified hearing officers." Minn. Stat. § 125A.091, subd. 13. Thereafter, the Commissioner's only role is to monitor and enforce the hearing officer's decisions. Id., subd. 25.

A prehearing conference is held within five days of the commissioner's appointment of the hearing officer and at the conference the hearing officer must:

(1) identify the questions that must be answered to resolve the dispute and eliminate claims and complaints that are without merit;
(2) set a scheduling order for the hearing and additional prehearing activities;
(3) determine if the hearing can be disposed of without an evidentiary hearing and, if so, establish the schedule and procedure for doing so; and
(4) establish the management, control, and location of the hearing to ensure its fair, efficient, and effective disposition.

Id., subd. 15. The statute states, "a hearing officer must limit an impartial due process hearing to the time sufficient for each party to present its case." Id., subd. 18. Also, "a hearing officer must establish and maintain control and manage the hearing." Id. The "amount of time parties will

have to present their cases" is determined "by balancing the due process rights of the parties with the need for administrative efficiency and limited public resources." Minn. Admin. R. 3525.4110, subp. 2 (A)(4).

Federal courts have addressed the imposition of time limits in the trial context, and the resulting case law provides useful guidance here. In <u>Johnson v. Ashby</u>, 808 F.2d 676, 678 (8th Cir. 1987), the Court acknowledged that: "[i]n this era of crowded district court dockets federal district court judges not only may but must exercise strict control over the length of trials." The Eighth Circuit also has endorsed trial court discretion to impose place reasonable limits on the presentation of evidence "to avoid undue delay, waste of time, or needless presentation of cumulative evidence." <u>Id.</u> at 678. A trial court's discretion to assert reasonable limits is not boundless:

> [I]t may be an abuse of the trial court's discretion to exclude probative, non-cumulative evidence simply because its introduction will cause delay, and any time limits formulated in advance of trial must be fashioned with this in mind. Such limits should be 'sufficiently flexible to accommodate adjustment if it appears during trial that the court's initial assessment was too restrictive.'

<u>Id.</u> Therefore, this Court will review the ALJs decision to set and enforce his timeline under an abuse of discretion standard.

At the prehearing conference, the ALJ asked counsel for both parties to estimate how much time they thought they needed to present their case. Plaintiffs' counsel suggested a day and a half for her part, and the School District estimated a day for its part.[6] The ALJ issued the Prehearing Order which granted each party "9 hours of hearing time to present the testimony of

---

[6] The Best Practices in Hearing Management of Special Education Disputes defines a hearing day as 6 hours. Compl. Attachment B.

its witnesses and to conduct cross-examination of the opposing party's witnesses." AR, Second Prehearing Order, June 17, 2013 ¶ 10. Counsel were directed to "plan their hearing presentations accordingly." Id. Thus, the ALJ properly exercised his statutory authority by establishing a reasonable hearing schedule after conferring with legal counsel for both parties.

There is no evidence on the administrative record that the ALJ abused his responsibilities under the law at trial. There is no evidence on the record, or in this appeal, that shows the Student's case to be particularly complicated. In fact, the issues were substantially narrowed when, before trial, the parties agreed on prospective relief for the Student. Plaintiffs' counsel made no objection to her time allotment until the second day of the hearing, even though concerns about the Plaintiffs' counsel's allocation of her time were raised by the ALJ and by counsel for the School District. When Plaintiffs' counsel finally objected after realizing that her presentation would exceed the time limit, the ALJ referenced both the MDE's "best practices" and Minnesota Statute § 125A.091, subd. 18. Hr'g Tr. at 446, 449. The ALJ revisited Plaintiffs' due process rights on the third day of the hearing, explaining that he researched the issue and found no reason in this case to extend what he had determined was an adequate amount of time to present the Plaintiffs' case. Id. at 779. Finally, the ALJ demonstrated flexibility, offering Plaintiffs a limited extension of time to make an offer of proof in any manner they chose—including calling the parents to testify. Id. at 718-19, 797-802.[7] Plaintiffs' counsel opted to make an informal offer of proof.

To the extent Plaintiffs argue that the ALJ's brief reference to the MDE's Best Practices

---

[7] Plaintiffs' Complaint confirms the ALJ Lipman's use of discretion to set time limits for his hearings. Plaintiffs allege that "In another special education administrative hearing, ALJ Lipman granted both sides 18 hours for the presentation of their evidence. . . ." Compl. ¶ 43.

in Hearing Management of Special Education Disputes was an abuse of discretion, the document belies the compulsory nature Plaintiffs ascribe to it. The document lists "Suggested Best Practices," and even the language of the best practice that Plaintiffs object to, reminds ALJs that "circumstances" dictate their ultimate time limit decisions, not the Best Practices document. Finally, Plaintiffs have not demonstrated abuse of discretion because Plaintiffs' counsel did not introduce any issues or circumstances that could cause the ALJ to reconsider his initial assessment of time allotments. Even considering the evidence and testimony Plaintiffs now claim they would have offered, the ALJ was reasonable in believing that the trial could be conducted in three days. Thus, Plaintiffs have not shown that the administrative hearing was procedurally flawed or that the ALJ abused his discretion.

## 2. Appeal of School Districts Procedural and Substantive FAPE Efforts

In a motion for judgment on the record brought pursuant to the IDEA, a district court must review the state administrative record, hear additional evidence if necessary, and grant such relief as it deems appropriate based on the preponderance of the evidence. 20 U.S.C. § 1415(i)(2); CJN ex rel. SKN v. Minneapolis Pub. Sch., 323 F.3d 630, 636 (8th Cir. 2003); K.E. ex rel. KE v. Indep. Sch. Dist. No. 15, 647 F.3d 795, 803 (8th Cir. 2011). "Although a district court should independently determine whether the child has received a FAPE, it must give 'due weight' to agency decision-making." CJN, 323 F.3d at 636. "IDEA does not require that a school either maximize a student's potential or provide the best possible education at public expense." Fort Zumwalt Sch. Dist. v. Clynes, 119 F.3d 607, 612 (8th Cir. 1997). Rather, a school district satisfies its obligations under the IDEA if: (1) it complies with the Act's procedural requirements and (2) the IEP is "reasonably calculated to enable the child to receive

educational benefits." <u>Bd. of Educ. of the Hendrick Hudson Cent. Sch. Dist. v. Rowley</u>, 458

U.S. 176, 206-07 (1982). A party challenging the implementation of an IEP must demonstrate

that the school authorities failed to implement a substantial or significant portion of the IEP.

<u>Neosho R-V Sch. Dist. v. Clark</u>, 315 F.3d 1022, 1027 n.3 (8th Cir. 2003) (noting distinction

between a challenge to an IEP and a challenge to the implementation of an otherwise appropriate

IEP).

     In determining whether a party dissatisfied with the result of a due process hearing is

entitled to relief from the judgment, "a court first inquires whether the state has complied with

the procedures set forth in the IDEA and then determines if the IEP is 'reasonably calculated to

enable the child to receive educational benefits.'" <u>K.E. v. Indep. Sch. Dist. No. 15</u>, No. 09-2433,

2010 U.S. Dist. LEXIS 51004, at *42-43 (D. Minn. May 24, 2010) (quoting <u>Rowley</u>, 458 U.S. at

206-07), <u>aff'd</u> 647 F.3d 795.

### a. Alleged Procedural Violations

     Plaintiffs allege the School District committed a number of procedural violations of

IDEA that denied the Student a FAPE. In their memorandum, Plaintiffs have not specifically

challenged the findings of the ALJ. <u>See</u> Pls.' Mem. Opp'n.[8] In addition to the procedural

objection to the due process hearing addressed above, it appears Plaintiffs have five procedural

objections to the School District's implementation of the IDEA plan for the Student's education.

Plaintiffs claim that the School District: (1) did not timely identify and evaluate the Student's

disabling conditions consistent with 20 U.S.C. § 1412(a)(3) and 34 C.F.R. § 300.311(a); (2) did

---

[8] Plaintiffs also misstate the standard of review, citing Rule 12(c) of the Federal Rules of Civil Procedure, which applies to judgment on the pleadings rather than to a judgment on the record.

not incorporate identified needs in the IEPs; (3) did not provide objectively measurable goals; (4) did not provide an accurate statement of the supplementary aides and services; and (5) did not consistently and accurately measure and report the Student's progress on his IEP.

### i. Failure to Evaluate

The IDEA requires IEP teams to "consider" evaluations of the student when developing the IEP. 20 U.S.C. § 1414(d)(3)(A)(iii). Plaintiffs argue the School District ignored the Fraser evaluation and its diagnosis of the Student as having ADHD. Plaintiffs argue that if the School District had followed the Fraser diagnosis, the Student would have been treated as having a "Specific Learning Disability."

The School District conducted a thorough analysis of the Student's case. Because the 2006 Fraser evaluation was not admitted into evidence, it is not a part of the administrative record.[9] However, the Fraser evaluation was discussed and incorporated into the School District's initial evaluation in 2009. Ex. 2. The School District noted the Student had an ADHD diagnosis and considered the Student's medical history, which included a prescription of an ADHD medication. The School District also did extensive testing of its own. Taking into consideration the Student's results, the School District determined the Student met the criteria for "Other Health Disabilities," and qualified for the services provided with such a designation. Therefore, Plaintiffs have not shown that the School District failed to evaluate the Student, or that it failed to do so in a timely manner.

---

[9] Plaintiffs' counsel attempted to have the Fraser evaluation authenticated by Tricia Hughes at the hearing, but she was unable to do so. Plaintiffs did not call any other witness to authenticate the document.

### ii. Incorporation of Identified Needs

Plaintiffs' second claim is that the Student's initial evaluation identified direct instruction service minutes as necessary, but this instruction was not continued into high school. First, Plaintiff misconstrues the change from 8th grade to 9th grade year. In 8th grade, the Student was enrolled in "Instruction-Reading and Written Language." In 2011, the Student entered high school and began 9th grade. He continued to receive direct instruction and support to address his reading and written language goals through the Essential English class—a special education class. Hr'g Tr. 588-87, 647; Exs. 10, 23. Second, a Student must receive a substantial or significant portion of his IEP. There is no evidence in the record, or in the Student's proposed additions to the record, that suggests the Student was not receiving a substantial portion of his IEP. This claim is without merit.

### iii. Objectively Measurable Goals and Reporting of Progress

Plaintiffs claim the Student's IEPs did not have goals and objectives that were measurable and that the Student's progress was insufficiently recorded and reported. The record reflects the ALJ fully analyzed Plaintiffs' three remaining procedural claims on measurable goals. AR, Findings of Fact Conclusions of Law and Order 16-17. The ALJ cited the appropriate law, 20 U.S.C. § 1414(d)(1)(A), and the appropriate standard, that an IEP is legally sufficient if it is "reasonably calculated to enable the child to receive educational benefits." Rowley, 458 U.S. at 206-07. The ALJ reviewed the evidence in the record and determined that the IEP goals were not so vague as to violate federal law. AR, Findings of Fact Conclusions of Law and Order 16. He also noted that the Student's IEP contained sufficient detail about the Student's present levels of performance and that it drew upon objective results from standardized

tests. In his findings the ALJ cited considerable evidence from the record supporting his conclusion. Id. at 6, 8-9, 10.

After reviewing the record, the Court agrees with the ALJ's findings. In addition, the School District's records show that it contacted the Parents regularly as issues arose. The School District also met with the Parents and developed new IEPs multiple times in response to the Parents' requests for modifications. Although the ALJ appropriately chastised the School District for shortcomings in documentation and measurement of the School District's interventions, the Court agrees that the administrative record as a whole reflects sufficient engagement on both sides.

### b. Alleged Substantive Violation

Plaintiffs also argue that the School District did not provide a FAPE for the Student because the School District's educational services for the Student failed to produce meaningful educational benefits and progress. However, the Supreme Court has determined that IDEA only requires that a school district design and implement an IEP that is "reasonably calculated to enable the child to receive educational benefits." Rowley, 458 U.S. at 206-07. The Eighth Circuit has held that although academic progress is an important factor, IDEA does not "guarantee that the student actually make any progress at all." CJN, 323 F.3d at 642.

The record reflects that the School District implemented IEPs reasonably calculated to achieve educational benefits for the Student, but the Student's behavior occasionally interfered with his progress. The Parties dispute whether the Student received any educational benefit at all from his 8th through 10th grade years. The Student's grades clearly fluctuated, sometimes improving and sometimes regressing. There are several exhibits in evidence, and testimony in

22

the administrative record, that show, the Student was frustrating the School District's efforts designed to help him. The Student was reported as tardy to class, and on occasion skipped classes altogether after lunch. He was also suspended more than once for poor behavior in school, including the incident with lighting a cigarette in class. Additionally, the Student returned to school after a suspension without having done the school work sent home with him. The IEPs reference these behavior problems and note ways in which the School District attempted to remedy them. The Court agrees with the ALJ:

> In this case, the best reading of the hearing record is that a wide range of supports, carefully calibrated to [the Student's] educational needs, were made available to him, and notwithstanding those interventions, [the Student] did not complete enough work in order to earn passing grades.

AR, Findings of Fact Conclusions of Law and Order 18. Thus, Plaintiffs have not shown substantive violations of the IDEA.

For these reasons, the School District's motion for judgment on the record is granted.

## B. State Defendant Claims

Plaintiffs claim that State Defendants are liable for the ALJ's decision to limit the time Plaintiffs were allotted to present their case. State Defendants have moved to dismiss all claims against them because they are not appropriate parties to this litigation and Plaintiffs lack standing to challenge State Defendants' "best practices" documents. For the reasons below, the Court agrees.

### 1. Motion to Dismiss Standard

Rule 12(b)(6) of the Federal Rules of Civil Procedure states a party may move to dismiss a complaint for failure to state a claim upon which relief can be granted. In ruling on a motion to

dismiss, the court views the pleadings in the light most favorable to the nonmoving party. Hamm v. Groose, 15 F.3d 110, 112 (8th Cir. 1994) (citation omitted). The ruling court may not consider evidence or allegations outside of the pleadings, but "documents necessarily embraced by the complaint are not matters outside the pleading[s]." Ashanti v. City of Golden Valley, 666 F.3d 1148, 1151 (8th Cir. 2012) (citation omitted).

### 2. Standing and Unnecessary Parties Law

To establish standing, a plaintiff must "allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." See Allen v. Wright, 468 U.S. 737, 751 (1984).

Rule 20(a) allows permissive joinder of defendants where the plaintiff seeks relief from multiple defendants based on the same underlying transaction or occurrence, and where a common question of law or fact exists among all defendants in the action. See Fed. R. Civ. P. 20(a). Rule 21 states parties "may be dropped or added by order of the court on motion of any party or of its own initiative at any stage of the action and on such terms as are just." Fed. R. Civ. P. 21. Courts may properly dismiss parties under Rule 21 if they do not satisfy Rule 20(a), or if no claim for relief is stated against them. See Great Am. Ins. Co. v. Louis Lesser Enters., 353 F.2d 997, 1001 (8th Cir. 1965).

### 3. Failure of Plaintiffs' Claims

There are no Minnesota cases directly on point discussing state agency liability for ALJ decisions, but the District of Connecticut has analyzed the issue in a similar case, and it persuasively explains why State Defendants should not be held liable in these circumstances. Quatroche v. E. Lyme Bd. of Educ., 604 F. Supp. 2d 403, 410-11 (D. Conn. 2009). In

Quatroche, a hearing officer at least partially based a jurisdiction decision on a letter issued by the Commissioner of Education which opined that hearing officers should not hear certain kinds of cases. In a system where the ALJ is supposed to be, by law, an independent hearing officer, allowing the state to interfere with the ALJ's statutorily granted discretion would be inappropriate. As a result, in Quatroche, the court noted that "liability may not flow from decisions over which State Defendants have no control and cannot legally influence." Id. at 411; see also Renollett v. Minn., Dep't of Educ., No. 03-cv-6452, 2004 U.S. Dist. LEXIS 12997, at *18 (D. Minn. July 13, 2004) ("The MDE is not a proper defendant to this claim because liability may not flow from decisions over which State Defendants have no control and cannot legally influence."). When there is a single hearing officer who has made a decision, even when he bases it on a state agency opinion, the state agency is not presumed to have interfered with a hearing officer's decision. See Pachl v. Seagren, 453 F.3d. 1064, 1070 (8th Cir. 2006).

Therefore, when as here, Parents' claims against the state agency are only challenging one hearing officer's decision, the state agency is not a proper party. As discussed above, the ALJ in this case used discretion to reasonably set a time limit for the Student's hearing. The ALJ in this case reflected on his responsibility to manage hearings:

> The statutory requirements [of Minn. Stat. § 125A.091, subd. 18(a), (b)] serve an important purpose. They shield everyone with an interest in the hearing process – parents, students, educators, school district staff, opposing counsel, the tribunal and taxpayers – from the very real burdens of an over-long trial. That interest is particularly acute in cases such as this, where regardless of the outcome of the litigation the parties still need to work productively and collaboratively together as part of a functioning IEP team.

AR, Findings of Fact Conclusions of Law and Order 19. Therefore, where the ALJ has unequivocally exercised his discretion, State Defendants cannot be held liable. Thus, the State

Defendants are not necessary or appropriate parties to the appeal of ALJ Lipman's decisions and are dismissed.[10]

Plaintiffs also lack standing because they have not identified a legally cognizable injury that is fairly traceable to State Defendants. The ALJ used discretion to manage the due process hearing, meaning State Defendants could not have injured Plaintiffs. Even if State Defendants had developed a policy that they hoped ALJs would adopt, the ALJ in this case did not adhere to the policy. Therefore, Plaintiffs do not have standing to bring this suit against the State Defendants.

Plaintiffs claim the ALJ strictly adhered to the 3-day, 9-hour per side time limit because the MDE and OAH had issued a directive requiring ALJs limit hearings to three days. There is no support for the argument that OAH and MDE's "best practice" guidance dictated the

---

[10] If the administrative record had not conclusively demonstrated ALJ Lipman knew he had discretion and exercised his ability to adjust the time limitations, dismissal at this stage may not have been warranted. Plaintiffs submitted an attachment to their Complaint that includes several documents. Taken in the light most favorable to Plaintiffs, these documents could suggest MDE and OAH cooperated in an attempt to impose limits on hearings by a "rule" couched in "best practices" language. If ALJs abandoned their discretion in favor of a rigid "rule," then due process rights may arguably be violated.

"[S]tate educational agencies may be responsible for violations of the IDEA when the state agency in some way fails to comply with its duty to assure that the IDEA's substantive requirements are being implemented." Pachl, 453 F.3d at 1070; Quatroche, 604 F. Supp. 2d at 411. Indeed, "a state education agency is only a proper party if an action involves 'systemic' violations of the IDEA." Adams v. Sch. Bd. of Anoka-Hennepin Indep. Sch. Dist. No. 11, No. 02-991, 2002 U.S. Dist. LEXIS 22444, at *6 (D. Minn. Nov. 18, 2002). And, "a claim is 'systemic' if it 'implicates the integrity or reliability of the IDEA dispute resolution procedures,' or 'requires restructuring the education system itself.'" Reinholdson v. Minnesota, No. 02-795, 2002 U.S. Dist. LEXIS 17169, at *18 (D. Minn. Sept. 9, 2002) (citing Doe v. Ariz. Dep't of Educ., 111 F.3d 678, 682 (9th Cir. 1997)), aff'd in part, abrogated in part, Reinholdson v. State, 346 F.3d 847, 851 (8th Cir. 2003) (declining to dismiss state agency because a trial of the other defendants could find support for systemic violations).

There is precedent supporting that a state agency is an appropriate party if there is a claim for a systemic violation and the Plaintiffs were themselves affected by this violation.

Prehearing Order the ALJ developed with counsel's input in this case. In addition, at the hearing the ALJ briefly referenced the MDE's "best practices," but he also referenced a Minnesota statute and the prehearing conference, where the parties indicated they needed 2.5 days and were granted more than their requested time. This is not a case where a plaintiff requested 5 days and received only 3. The ALJ provided three days based on the parties' request and on the third day offered Plaintiffs' counsel an additional 30 minutes to make an offer of proof concerning matters which had not been addressed. Furthermore, ALJ Lipman has set and conducted longer hearings which exceed the three day "rule." See Compl. ¶ 43. Finally, ALJ Lipman considered Plaintiffs' request for additional time overnight, researched the issue, and explained his reasons for the time limitations. The allegation that he abandoned his responsibility to balance Plaintiffs' due process rights is not plausible.

### 4. State Defendants' Remaining Counts

Because State Defendants are not proper parties to this lawsuit, and because Plaintiffs do not have standing, Plaintiffs' remaining claims are dismissed.[11]

The remainder of Plaintiffs' Motion for Summary Judgment against State Defendants is likewise dismissed.

---

[11] State Defendants raised and argued that they are also protected from Plaintiffs' Fourteenth Amendment, 42 U.S.C. § 1983, and state law claims by the Eleventh Amendment. As State Defendants are not appropriate parties and the Plaintiffs do not have standing, the Court does not reach these arguments.

## IV. CONCLUSION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS**

**HEREBY ORDERED** that:

1.   Plaintiffs B.S., a minor child, by and through his parents and natural guardians,

     K.S. and M.S.'s Motion for Summary Judgment [Docket No. 25] is **DENIED**;

2.   Defendants Anoka-Hennepin Public Schools, ISD No. 11, and Tom Heidemann's

     Motion for Judgment on the Record [Docket No. 22] is **GRANTED**; and,

3.   Defendants Minnesota Department of Education, Brenda Cassellius, Office of

     Administrative Hearings, and Tammy Pust's Motion to Dismiss [Docket No. 15]

     is **GRANTED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

BY THE COURT:

ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated: 27 May 2014